(C. D. 623)

A. J. Rimberg *v.* United States

United States Customs Court, Third Division

(Decided April 29, 1942)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney), for the defendant.

Before Cline, Keefe, and Ekwall, Judges

Keefe, Judge: This action arising at Philadelphia involves merchandise invoiced as "Liquid Rosin," which was reported to consist of a clear, light, amber-colored liquid manufactured from the rosin and fatty oil soaps in sulphate paper pulp waste liquor by a process of acidifying a water solution of the soaps and purifying the resulting rosin and fatty acids by fractional distillation. Upon such report the collector classified the merchandise as a nonenumerated manufactured article at 20 per centum ad valorem under paragraph 1558, act of 1930.

The plaintiff claims that the merchandise is dutiable as a waste at 10 per centum ad valorem under paragraph 1555, or at 7½ per centum under said paragraph as amended by the British Trade Agreement, T. D. 49753; or as distilled or essential oils at 12½ per centum ad valorem under paragraph 58, as amended by the French Trade Agreement, T. D. 48316; or as "turpentine, gum and spirits of, and rosin, 5 per centum ad valorem" under paragraph 90; or free of duty under paragraph 1686 as "natural gum resin, and natural resins, not specially provided for"; or paragraph 1722, as "vegetable substances, crude or unmanufactured"; or under paragraph 1731, as "oils, distilled or essential"; or paragraph 1732 as expressed or extracted oils. The claim chiefly relied on is the provision in paragraph 90, *supra*, and, alternatively, the claim under paragraph 58. reading: "all other

essential and distilled oils not specially provided for." Although the other claims were not waived, it was admitted that the product was not a waste.

The importer testified that he was a distributor of the product in the United States; and that it was not manufactured prior to 1923, and no sales were made in the United States before 1936. The product, according to the witness, is derived as a byproduct in the production of sulphate wood pulp produced from pine trees. In producing the wood pulp, chips of wood are cooked with certain chemicals, with the result that 50 per centum of the wood is dissolved, and is drawn off for further processing. The remainder is a waste containing the chemicals. These chemicals are then recovered from the waste for reuse leaving a residue composed of turpentine, rosin acids, and fatty acids. This residue is washed with sulphuric acid, and the turpentine, content recovered. The residuum contains the fatty acids and the rosin acids. By means of a chemical treatment these acids are combined resulting in a product known as crude liquid rosin or tall oil. As imported herein, the product is a distillate of such crude liquid rosin or tall oil. The object of the distilling process "is aimed to drive out * * * more or less all of the rosin acids contained in the crude and to leave us with a product which contains much more of the fatty acids." (Record, p. 6.)

The witness further testified that the product was sold as often under the name tall oil as liquid rosin; that the product is different from rosin in that regular rosin contains from 98 to 100 per centum of rosin acids whereas the so-called liquid rosin contains only about 25 or 30 per centum; that the chemical and physical properties are decidedly different from rosin; and that although the product may be used as a substitute for rosin it is entirely too valuable for such purpose and is not so commercially used. The witness stated that he was familiar with the term "essential oils" but he had never dealt in such oils.

The only question in this case is whether or not the imported merchandise is more specifically provided for in the Tariff Act of 1930 than under the provision in paragraph 1558 as a nonenumerated manufactured article.

The plaintiff contends that as paragraph 90 provides for gum of turpentine and spirits of turpentine as well as for rosin, the liquid rosin herein is either directly dutiable thereunder or becomes so dutiable by reason of the similitude clause of paragraph 1559, because said paragraph is designed to include the principal products obtained from the distillation of pine tree sap; that turpentine as well as rosin are the byproducts obtained from pine trees and are obtained by distilling the juices or the sap of pine trees. While the imported product is not the ordinary brittle rosin, it is obtained directly from the distillation of the sap or juices of pine trees, and is

identified as a kind of rosin, and therefore is dutiable under the *eo nomine* provision therefor, which is without limitation and consequently includes rosin in all its forms known to commerce. The further contention is made that the commodity herein, being a distilled oil, is, either directly or by virtue of the similitude clause, classifiable under paragraph 58 under the provision for distilled oils, not specially provided for, inasmuch as distilled vegetable oils are provided for therein *per se* and the merchandise herein is of an oily nature and in a liquid form obtained by processes of distillation from vegetable substances.

It is the contention of the Government that the plaintiff has failed to overcome the presumption of correctness of the collector's classification; that the plaintiff testified that the imported product differs both chemically and physically from rosin; that the liquid rosin was not generally so known in the trade; and that the evidence fails to establish the chief use of the liquid rosin or of rosin in the trade and commerce of this country, or that it is recognized in the trade as a form of rosin. As liquid rosin differs in name, in use, and in its physical and chemical characteristics from rosin, it is contended that it is not classifiable thereunder either directly or by virtue of the similitude clause. It is likewise contended that the merchandise does not fall within the description of articles provided for in paragraph 58, as the distilled oils therein have been held to be limited to essential oils produced by distillation, and the evidence fails to disclose that the liquid rosin is an essential oil.

Rosin is defined in Funk & Wagnalls New Standard Dictionary as follows:

1. Same as resin. 2. Specif., the resin forming the residue after the distillation of oil of turpentine from crude turpentine. It is a brittle amber-colored solid, and is used on violin-bows, in the manufacture of varnish, etc.

Resin is defined in the same dictionary as follows:

1. An amorphous substance that exudes from plants, supposed to be the product of oxidation of volatile oils secreted by the plant. Electrically, it is a nonconducting substance, and in the form of amber led to the discovery of electricity. * * * Resins are hard or soft according to the amount of oil they contain and the length of time they have been exposed to the air. They are usually soluble in alcohol, but insoluble in water. Nearly all plants yield resins by extraction with alcohol, and many of these bear names similar to the gums and oils that accompany them. They are used chiefly for varnishes, making sealing-wax or soap and in pharmacy. Among the resins are *acouchi, asafetida bdellium, gamboge, jalap, myrrh, scammony* and *turpentine.*

In the light of the foregoing definitions, it is clear that the provision for rosin in paragraph 90 was intended to relate solely to the resin derived from turpentine, and commonly known as rosin.

Turpentine is defined as follows:

Turpentine is essentially a solution of colophony or resin in *oil of turpentine* (see phrase below), usually 75 to 90 per cent. resin in 25 to 10 per cent. oil. When subjected to distillation with steam the oil of turpentine passes off and the colophony remains behind. * * * oil of t., a colorless inflammable liquid formed when turpentine is distilled with steam and consisting of a mixture of terpenes, especially pinene.

Spirits of turpentine is defined in the same dictionary as "the volatile oil of turpentine."

The provision for "Turpentine, gum and spirits of, and rosin" first appeared in the Tariff Act of 1922, under free list paragraph 1688. The Summary of Tariff Information, 1921, describes turpentine and rosin as follows:

*Description and uses.*—Turpentine, strictly speaking, is the oleo-resin exudation of coniferous trees, but the term is also applied to the *oil or spirits of turpentine* which is obtained by distilling the *crude gum.* * * * Wood turpentine is oil of turpentine obtained from pine wood by destructive or steam distillation. Oil of turpentine is chiefly used in the manufacture of paints and varnishes. * * *

Rosin is the brittle resin remaining after the turpentine is distilled. In commerce it is graded and sold according to color. The chief uses are as a size in paper making and in the manufacture of lead and manganese resinates, which are used as paint driers. It is also used in soap making and in the textile industry.

In view of the foregoing common and tariff meanings as applied to the products specifically provided for under paragraph 90, of which we may presume Congress was fully cognizant, it is clear that the legislation relative to duty thereon was enacted for the purpose of providing a tariff upon a form of resin known as rosin having the physical characteristics of a brittle amber-colored solid, and upon turpentine whether distilled or in the crude gum state. The merchandise herein is neither crude nor distilled turpentine, nor is it rosin, as commonly known. In order that the merchandise may be included within the provision of paragraph 90 by virtue of the similitude clause, it is essential for the plaintiff to establish that it is similar in material, quality, texture, or use, and that such similitude is substantial.

From the evidence before us we are of the opinion that there is no similitude of material for the following reasons. Rosin is the residue remaining after the distillation of turpentine. The product before us is derived from a crude substance containing turpentine, rosin acids and fatty acids, from which the turpentine has been recovered, and the residue subjected to a chemical treatment causing the fatty acids and the rosin acids to combine to form a crude substance called crude liquid rosin, which, in turn, is distilled in order to drive out as much of the rosin acids as possible and leave the fatty acids. The Government chemist found the imported material contained 14.81 per centum

of rosin acid, and, according to the plaintiff, the turpentine content had been removed from the basic material. The percentage of rosin acid remaining in the substance herein is insufficient to create a similitude in material to rosin.

An inspection of the sample of the imported material, in evidence as exhibit 1, is convincing that there is no similitude of quality or texture either with turpentine or with rosin. The product imported herein is in the form of a liquid, which at certain temperatures will become a soft sludge. The rosin provided for in paragraph 90 is a brittle amber-colored solid. There can be no similitude of quality or texture between a liquid and a solid. See *Lang* v. *United States*, 4 Ct. Cust. Appls. 129, T. D. 33394.

The evidence adduced relative to similitude through use with rosin clearly is insufficient. Although it was shown that the merchandise could be used as a substitute for rosin, it was not commercially feasible to use it for such purpose. There was no evidence relative to the similitude in use to turpentine.

Upon the facts presented we find that there is no similarity in material, quality, texture, or use of the imported material to any of the products *eo nomine* provided for in paragraph 90, and that claim is accordingly overruled.

Regarding the claim that the merchandise is dutiable either directly or by similitude under paragraph 58 as distilled or essential oils, we find nothing in the evidence to warrant classification thereunder. Indeed, the plaintiff testified that although he was familiar with the term "essential oils" he had never dealt in such oils. In the case of *Bisbee Linseed Co.* v. *United States*, 19 C. C. P. A. 101, T. D. 45242, the court, as aptly paraphrased in Government brief, found relative to the terms "essential or distilled oils" as follows: "essential or distilled oils" must be given a restricted meaning and should be limited to that well-known class of essential oils which were produced for the most part by distillation; that the word "or" used therein was a coordinating conjunction and was not used disjunctively. The court there held that the provisions for essential or distilled oils were intended to embrace not two but one group of oils; that the words "essential" and "distilled" were used in a descriptive, not alternative, sense to define the same group of oils.

Inasmuch as the evidence is clearly insufficient to establish that the imported material is classifiable under any of the paragraphs claimed, and it is admittedly an article produced from a byproduct, we hold it properly classifiable as a nonenumerated manufactured article, as assessed by the collector.

For the reasons stated, judgment will be entered in favor of the defendant.